UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MANES' PHARMACY, INC.                                                                        PLAINTIFF

v.                                        No. 2:22-cv-2186

AMERISOURCEBERGEN DRUG CORPORATION                                  DEFENDANT

## OPINION AND ORDER

Before the Court are Plaintiff Manes' Pharmacy, Inc.'s ("Manes") motion for temporary restraining order and preliminary injunction (Doc. 5), and Defendant AmerisourceBergen Drug Corporation's ("AmerisourceBergen") response in opposition (Doc. 16).  The Court previously denied Manes' request for a temporary restraining order ("TRO"), but deferred ruling on Manes' request for a preliminary injunction until the Court could conduct an evidentiary hearing.  That hearing occurred over two non-consecutive days: January 24 and 26, 2023.  For the reasons given below, Manes' motion for preliminary injunction will be DENIED.

As this Court previously recounted in its order denying Manes' request for a TRO:

> This dispute arises between a pharmacy and the pharmacy's wholesale distributor of, among other products, controlled substances.  Manes is a pharmacy that has served the local Van Buren, Arkansas community for nearly 40 years. (Doc. 4, p. 2).  AmerisourceBergen is a wholesale distributor of pharmaceutical products, including controlled substances.  (Doc. 16, p. 4).  Manes alleges that it has purchased pharmaceuticals from AmerisourceBergen for over 15 years.  (Doc. 4, p. 3).  Manes purchases "many different medications" from AmerisourceBergen's facility in Tulsa, Oklahoma.  *Id.*  According to AmerisourceBergen, the wholesaler sells Manes both controlled and non-controlled substances.  (Doc. 16, p. 10).
>
> The crux of this dispute and the instant motion arise from AmerisourceBergen's decision to restrict its sale of controlled substances and listed chemicals to Manes.[1] In a November 2, 2022 letter memorializing that decision, AmerisourceBergen explained that members of its Controlled Substance Monitoring Program reviewed Manes' dispensing practices and identified several "red flags."  (Doc. 4, p. 400;

---

[1] For convenience, controlled substances and listed chemicals will collectively be referred to as "controlled substances" throughout this Opinion and Order.

1

Doc. 16-4). Specifically, AmerisourceBergen was concerned that Manes: (1) dispensed controlled substances for prescriptions from family/general practitioners; (2) dispensed combinations of opioids and benzodiazepines; (3) dispensed multiple controlled substances in the same therapeutic class concurrently; and (4) dispensed controlled substances to a dentist in large quantities. *Id.* Manes was given the opportunity to dispute or respond to these allegations in writing. *Id.*

Manes responded to the letter and indicated that it would change its dispensing practices to comply with AmerisourceBergen's letter. (Doc. 4, p. 404). Manes' owner also requested reconsideration of AmerisourceBergen's decision to cease sales, stating "I am willing to do what ever I have to do to avoid suspension of sales of controlled substances." *Id.* AmerisourceBergen acknowledged receipt of the reconsideration request the same day. (Doc. 4, p. 406). Six days later, AmerisourceBergen sent a second letter stating that Manes' letter did not adequately address its concerns. (Doc. 4, p. 411; Doc. 16-5). AmerisourceBergen indicated that its restriction of controlled substance sales to Manes would go into effect on November 30, 2022. *Id.*

Manes sued AmerisourceBergen on December 2, 2022 in Arkansas state court for breach of contract, tortious interference with business expectancy, and violation of the United States and Arkansas Constitutions' procedural due process clauses. (Doc. 4). Manes contemporaneously filed this motion for a temporary restraining order and preliminary injunction, seeking an order requiring AmerisourceBergen to continue its sale of controlled substances to Manes. (Doc. 5). AmerisourceBergen removed the case to this Court on December 6, premising its removal on both diversity and federal question jurisdiction. (Doc. 2).

The Court ordered AmerisourceBergen to provide an expedited response to Manes' motion. (Doc. 7). AmerisourceBergen filed its response on December 9, 2022. (Doc. 16). The Court issued an order later that same day denying Manes' request for a TRO, but deferred ruling on the request for a preliminary injunction until an evidentiary hearing could be held. (Doc. 17).

Requests for TROs and preliminary injunctions are evaluated under the same standard, *see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir 2022), which consists of the four so-called "*Dataphase* factors": "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inv. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The movant, Manes, has

the burden of establishing that injunctive relief is proper. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). While no single factor is dispositive, relief will be denied if irreparable harm is not shown. *Id.*

The Court's December 9 order denying a TRO found that Manes had not shown any threat of irreparable harm; therefore, the Court declined to address the other three *Dataphase* factors. The Court noted that closure of a business may constitute irreparable harm, *see, e.g.*, *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986), and that Manes had alleged it would likely have to close its business if AmerisourceBergen was not enjoined from terminating its sales of controlled substances to Manes. *See* Doc. 17, p. 3. However, since Manes had not provided any concrete numbers in support of the claim that it was in danger of closure, the Court concluded there was no factual basis to make such a finding. *See id.* at 3–4 (citing *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183–84 (8th Cir. 2019).

The Court also observed:

> Furthermore, given the record currently before it, the Court is skeptical that Manes is actually in imminent danger of shuttering its doors. AmerisourceBergen apparently is not terminating its entire relationship with Manes, but rather is only terminating its sales of controlled substances to Manes. *See* Doc. 16-4, p. 2. According to sworn testimony from Duane Stickles, who is a Senior Director of Diversion Control for AmerisourceBergen, controlled substances account for only 15% by value of the prescription medications that Manes purchased from AmerisourceBergen during the first 11 months of 2022. *See* Doc. 16-1, ¶¶ 30–31. A good deal of relevant information is not presently available to the Court, such as Manes' operating expenses, profit margins, or even what percentage of Manes' revenues are derived from sales of controlled substances. But the limited information currently in the record indicates that Manes is only in danger of losing, at most, 15% of its revenues. Of course that is likely a significant hardship, and the Court does not mean to trivialize it. But the Court is presently unpersuaded that Manes cannot survive the termination of its ability to purchase controlled substances from AmerisourceBergen, at least until a hearing can be held on Manes' request for a preliminary injunction.

(Doc. 17, p. 4).

The evidence presented at the recent hearing has only confirmed the Court's initial skepticism on this front. In particular, the evidence showed that Manes is on track to lose roughly 16% of its annual revenues because of AmerisourceBergen's decision to terminate its sales of controlled substances to Manes.[2] While this is no trivial amount, no evidence in the record shows that Manes cannot survive that loss. Additionally, testimony showed that Manes has found a different source for some of its controlled substances. In other words, this harm appears financially compensable rather than irreparable. "Recoverable monetary loss may constitute irreparable harm *only* where the loss threatens the very existence of the petitioner's business." *Packard Elevator*, 782 F.2d at 115 (emphasis added; internal alterations omitted).

Perhaps recognizing these shortcomings, counsel for Manes emphasized another theory of irreparable harm in his closing argument at the evidentiary hearing: that AmerisourceBergen's actions have inflicted *reputational* harm on Manes. "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury" because such harms are "difficult, if not impossible to quantify in terms of dollars." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). However, the testimony at the hearing largely undermines this theory. Mark Manes (Manes' owner) and Michelle McClure (a pharmacist at Manes) both testified that although Manes has lost customers as a result of AmerisourceBergen's actions, those losses were not due to lost goodwill or reputation, but rather to Manes' inability to fill those customers' prescriptions for Schedule II controlled substances any longer. Indeed, Mr. Manes and Ms. McClure both testified that their customers have been understanding and forgiving throughout this process.

---

[2] Mr. Manes testified that he expects to lose roughly $300,000.00 out of a total $1.8 million in annual sales, which amounts to 16.67%. Other documentary evidence projects losses closer to 15.5%. *See* Def. Ex. 16, p. 1.

But the matter of reputational harm becomes more complicated once one turns away from Manes' customers and looks towards its potential suppliers. Manes presented evidence showing that after AmerisourceBergen terminated sales of controlled substances to it, two wholesalers likewise refused to sell controlled substances to Manes, citing AmerisourceBergen's decision to terminate sales of controlled substances to Manes as the reason for their refusals. *See* Pl. Exs. 19, 20. Manes has also applied to two other wholesalers who have not yet decided whether to sell controlled substances to Manes. When one party's negative judgment about another entity influences third parties to make the same negative judgment about that entity, this constitutes textbook reputational harm. Therefore, Manes has made at least a slight showing of irreparable harm, though this harm is somewhat mitigated by the fact that Manes can apply for reinstatement at AmerisourceBergen after one year.

Under the second *Dataphase* factor, the Court must balance the threat of irreparable harm against the injury that granting the injunction would inflict on AmerisourceBergen. On the one hand, an injunction ordering AmerisourceBergen to continue selling controlled substances to Manes would likely work to both parties' short-term economic *benefit*; after all, AmerisourceBergen presumably profits from its sales of controlled substances to willing buyers. However, such an injunction would also constrain AmerisourceBergen's ability to comply with the terms of a settlement agreement it recently reached with various states' attorneys general and local government entities.[3] Under this agreement, AmerisourceBergen must take a variety of proactive measures designed to ensure that the controlled substances it sells are not being diverted or abused by pharmacies or patients. Any injunction entered here would thus need to permit

---

[3] The Court notes that among those local government entities is the City of Van Buren, Arkansas, where Manes Pharmacy is located. ECF No. 4, pp. 106, 166.

5

AmerisourceBergen to exercise ongoing reasonable judgment as to whether such concerns might warrant termination of controlled-substances sales to Manes—but AmerisourceBergen insists that is exactly what it has already done.  The Court does not see how it can craft an injunction in this case that provides any meaningful relief to Manes while properly balancing the equities under the second *Dataphase* factor.  Therefore, this factor weighs heavily against granting injunctive relief.

The public interest does not tip the scales any further in either direction.  The Court finds that while the public has an interest in not seeing patients' care disrupted by the sudden termination of access to needed medicine, the public also has an interest in seeing steps taken to reduce the risk of dangerous drugs' diversion or abuse.  These conflicting interests are very difficult to quantify, and in the Court's view neither outweighs the other here.

As for Manes' probability of success on the merits, the Court should first make a few remarks about the governing standard.  "[M]athematical precision" is neither possible nor appropriate for this sort of "probability" inquiry.  *See Dataphase*, 640 F.2d at 113.  Furthermore, although likelihood of success on the merits is often described as "the most important" factor, *see, e.g.*, *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam), that does not mean it is dispositive, *see Dataphase*, 640 F.2d at 113.  To obtain a preliminary injunction, the movant "must simply show a 'fair chance of prevailing'" and need not "prove a greater than fifty per cent likelihood that it will prevail on the merits."  *See Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (internal alterations omitted).  However, what constitutes a sufficiently strong showing to warrant injunctive relief in a particular case necessarily depends on how the other three *Dataphase* factors weigh.  For example, "where the balance of other factors tips decidedly toward" the movant, then a preliminary injunction may issue if the movement has merely "raised questions so serious and difficult as to call for more deliberate

6

investigation." *See Dataphase*, 640 F.2d at 113. On the other hand, when the other *Dataphase* factors weigh in the aggregate against injunctive relief, then the movant "faces a heavy burden of demonstrating that he is likely to prevail on the merits." *See id.* Here, as discussed above, there has been a slight showing of irreparable harm, but the equities of the situation heavily favor AmerisourceBergen and the public interest is neutral. Taken together, therefore, the other three *Dataphase* factors weigh against granting injunctive relief.

The Court presently assesses Manes' odds of success on the merits as low, but not insignificant. Manes has raised substantial questions that call for more deliberate investigation, but it has not demonstrated a sufficiently high likelihood of success on the merits to overcome the aggregate weight of the other three factors against injunctive relief.

The Court emphasizes, just as it did in its previous Opinion and Order denying the TRO, that none of its findings or conclusions here constitutes law of the case, and that the Court remains free to change its mind once the record is further developed. *See, e.g., Travelers Ins. Co. v. Westridge Mall Co.*, 826 F. Supp. 289, 293 n.2 (D. Minn. 1992) (citing *Berrigan v. Sigler*, 499 F.2d 514 (D.C. Cir. 1974)). But with that significant caveat, the Court is presently very skeptical of Manes' procedural due process claim. Even if AmerisourceBergen's decision to terminate sales of controlled substances to Manes was motivated by a settlement agreement it reached with various state actors, AmerisourceBergen is itself a private actor and its decision here is ultimately one of whether to engage in commercial activity. It appears to have exercised its own independent judgment and does not appear to have been compelled by any state actor to terminate sales of controlled substances to Manes. Thus, the Court is not presently persuaded that AmerisourceBergen qualifies as a "state actor" against which relief can be sought for violations of

procedural due process. *Cf. Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (listing "limited circumstances" in which a private entity can qualify as a state actor).

Manes' odds of success appear somewhat higher on its breach of contract and tortious interference claims, though not enough to tip the *Dataphase* scales in Manes' favor overall. The Court believes AmerisourceBergen has a strong argument that it had a contractual right to terminate sales of controlled substances to Manes for virtually any reason whatsoever. *See* Def. Ex. 11, § 7(A). However, the Court cannot at this stage completely discount Manes' argument that the way in which AmerisourceBergen went about making this decision implicates its contractual duty of good faith and fear dealing,[4] as well as its common-law duty not to improperly interfere with Manes' business expectancies with its customers. *Cf. Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 444–45 & n.2, 47 S.W.3d 866, 875 & n.2 (2001) (discussing factors to consider when evaluating whether defendant's conduct was "improper" for purposes of tortious interference claim).

To this point, the Court must confess that it finds certain aspects of AmerisourceBergen's conduct towards Manes rather baffling. Although AmerisourceBergen's initial inquiries into Manes' dispensing practices were reasonable, motivated by legitimate concerns, and grounded in objective data, its only meaningful discussion of these concerns with Manes occurred during a single unscheduled phone call that took place while Mr. Manes was very busy at work, short-staffed, and apparently did not have much of the requested information quickly available. It is undisputed that Mr. Manes requested that AmerisourceBergen schedule a follow-up call with him,

---

[4] Arkansas "does not recognize a separate tort cause of action for breach of [the] implied covenants" of good faith and fair dealing which accompany every contract. *See West Memphis Adolescent Residential, LLC v. Compton*, 2010 Ark. App. 450, at *9, 374 S.W.3d 922, 927. But these duties can implicate claims for breach of contract. *See id.* at *5–*7, 374 S.W.3d at 925–26.

and it is undisputed that AmerisourceBergen declined to do so. The evidence received at the hearing overwhelmingly shows that Mr. Manes repeatedly attempted through written correspondence to provide AmerisourceBergen the information he was unable to provide during their initial phone conversation, and that AmerisourceBergen sidestepped these attempts and refused to engage in any further meaningful discussion of the matter—even though AmerisourceBergen employee Duane Stickles' testimony shows there is at least one other Arkansas pharmacy with which AmerisourceBergen was more accommodating during similar proceedings. AmerisourceBergen persisted in its mistaken belief that Manes lacked any written policy for addressing red flags, even though documentary evidence at the hearing clearly showed that in fact such a policy existed at the time of these communications. *See* Pl. Ex. 10. Furthermore, the totality of the evidence received at the hearing strongly indicates that all the "red flags" AmerisourceBergen identified with respect to Manes were ultimately the result of medically appropriate prescriptions that were filled in the exercise of sound pharmacological judgment. It is difficult to escape the conclusion that this litigation results more from AmerisourceBergen's inexplicable intransigence and bureaucratic rigidity than from Manes' pharmaceutical dispensing practices. Whether a jury would find that conduct to be "improper" or to breach any duty of good faith and fair dealing is hard to say at this point; but at this very early stage of litigation, such an outcome does not strike the Court as completely implausible.

Nevertheless, considering all the *Dataphase* factors together, the Court concludes that injunctive relief is not appropriate here. As described above, Manes' showing on the first factor (irreparable harm) has been only slight: Manes has not presented any evidence that it will close because of the loss of controlled substances sales, and its reputational damage appears relatively low. On the other hand, the second factor (relative harms) weighs heavily against granting

injunctive relief. The public-interest factor does not weigh significantly in either direction. And although Manes has raised some serious questions on the merits that call for more deliberate investigation, it has not demonstrated strong enough odds of success to overcome the other three factors' aggregate weight against granting injunctive relief. IT IS THEREFORE ORDERED that Plaintiff Manes' Pharmacy's motion for preliminary injunction (Doc. 5) is DENIED.

IT IS SO ORDERED this 1st day of February 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE